1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11   JULIA VERONICA GONZALEZ,     ) Case No. CV 15-4541-JPR
                                  )
12                   Plaintiff,   )
                                  )
13            v.                  ) **MEMORANDUM DECISION AND ORDER**
                                  ) **AFFIRMING COMMISSIONER**
14   CAROLYN W. COLVIN, Acting    )
     Commissioner of Social       )
15   Security,                    )
                                  )
16                   Defendant.   )
                                  )
17   _____

18   **I.    PROCEEDINGS**

19         Plaintiff seeks review of the Commissioner's final decision

20   denying her application for Social Security disability insurance

21   benefits ("DIB").  The parties consented to the jurisdiction of

22   the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).

23   The matter is before the Court on the parties' Joint Stipulation,

24   filed April 7, 2016, which the Court has taken under submission

25   without oral argument.  For the reasons stated below, the

26   Commissioner's decision is affirmed.

27

28

                                  1

## II.   BACKGROUND

Plaintiff was born in 1968.  (Administrative Record ("AR") 67.)  She graduated from high school and received her associate of arts degree but did not complete her bachelor's degree.  (AR 67-68.)  She worked as a supervisor from 1996 to 2010 and a preschool teacher before that.  (AR 72, 74, 141, 228.)

On October 13, 2011, Plaintiff protectively filed an application for DIB (AR 120; see also AR 88), alleging that she had been unable to work since March 16, 2011, because of diabetes, fibromyalgia, chronic pain in her right thigh, sporadic paralysis of her right legs, severe cramping of her hands and fingers, migraine headaches, high blood pressure, heart problems, retinopathy, loss of vision, neuropathy, aneurysm, breast lumps, and depression.  (AR 140.)  After her application was denied initially, on April 19, 2012 (AR 91-94), and on reconsideration (AR 576-77), she requested a hearing before an Administrative Law Judge (AR 96).  A hearing was held on February 27, 2013, at which Plaintiff, who was not represented by counsel,[1] testified.  (AR 53-87.)  Following the hearing, the ALJ propounded interrogatories to a vocational expert (AR 212) and provided Plaintiff the opportunity to comment on the VE's responses, submit more evidence, or ask for cross-interrogatories (AR 236).  Plaintiff did not respond.  (AR 34.)

In a written decision issued June 7, 2013, the ALJ found Plaintiff not disabled.  (AR 33-47.)  Plaintiff requested review

_____

[1] Plaintiff was represented by counsel before the Appeals Council, however.  (See AR 9.)

1 from the Appeals Council, and on April 30, 2015, it denied
2 review.  (AR 1-3.)  This action followed.

3 **III.  STANDARD OF REVIEW**

4      Under 42 U.S.C. § 405(g), a district court may review the
5 Commissioner's decision to deny benefits.  The ALJ's findings and
6 decision should be upheld if they are free of legal error and
7 supported by substantial evidence based on the record as a whole.
8 See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra
9 v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial
10 evidence means such evidence as a reasonable person might accept
11 as adequate to support a conclusion.  Richardson, 402 U.S. at
12 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).
13 It is more than a scintilla but less than a preponderance.
14 Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.
15 Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether
16 substantial evidence supports a finding, the reviewing court
17 "must review the administrative record as a whole, weighing both
18 the evidence that supports and the evidence that detracts from
19 the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715,
20 720 (9th Cir. 1998).  "If the evidence can reasonably support
21 either affirming or reversing," the reviewing court "may not
22 substitute its judgment" for the Commissioner's.  Id. at 720-21.

23 **IV.   THE EVALUATION OF DISABILITY**

24      Claimants are "disabled" for purposes of receiving Social
25 Security benefits if they are unable to engage in any substantial
26 gainful activity owing to a physical or mental impairment that is
27 expected to result in death or has lasted, or is expected to
28 last, for a continuous period of at least 12 months.  42 U.S.C.

3

§ 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step evaluation process to assess whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.  § 404.1520(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, the claimant is not disabled and her claim must be denied.  § 404.1520(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed.  § 404.1520(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant

4

1  has sufficient residual functional capacity ("RFC")[2] to perform

2  her past work; if so, she is not disabled and the claim must be

3  denied.  § 404.1520(a)(4)(iv).  The claimant has the burden of

4  proving she is unable to perform past relevant work.  <u>Drouin</u>, 966

5  F.2d at 1257.  If the claimant meets that burden, a prima facie

6  case of disability is established.  <u>Id.</u>

7      The Commissioner then bears the burden of establishing that

8  the claimant is not disabled because she can perform other

9  substantial gainful work available in the national economy.

10  § 404.1520(a)(4)(v); <u>Drouin</u>, 966 F.2d at 1257.  That

11  determination comprises the fifth and final step in the

12  sequential analysis.  § 404.1520(a)(4)(v); <u>Lester</u>, 81 F.3d at 828

13  n.5; <u>Drouin</u>, 966 F.2d at 1257.

14      B.   <u>The ALJ's Application of the Five-Step Process</u>

15      At step one, the ALJ found that Plaintiff had not engaged in

16  substantial gainful activity since March 16, 2011, the alleged

17  onset date.  (AR 36.)  At step two, he concluded that she had

18  "determinable conditions of ill-being" of "status post

19  hysterectomy"; degenerative disc disease of the lumbosacral

20  spine; diabetes mellitus with signs of glaucoma and diabetic

21  retinopathy and neuropathy; hypertension; obesity; and adjustment

22  disorder with depressed mood.  (<u>Id.</u>)  He found that some of these

23  conditions were not severe individually but were in combination.

24  (<u>Id.</u>)  The ALJ rejected all other conditions as not medically

25  determinable "[i]n view of the medical evidence (or lack

26

27      [2] RFC is what a claimant can do despite existing exertional
and nonexertional limitations.  20 C.F.R. § 404.1545; <u>see</u> <u>Cooper</u>
28  <u>v. Sullivan</u>, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

1  thereof).” (AR 36-37.)  At step three, he determined that
2  Plaintiff's impairments did not meet or equal a listing. (AR
3  39.)

4      At step four, the ALJ found that Plaintiff had the RFC to
5  perform a full range of light work.  (AR 40.)  In particular, she
6  could lift 25 pounds occasionally and 10 pounds frequently.
7  (Id.)  She could stand and walk up to six hours and sit up to six
8  hours in an eight-hour workday.  (Id.)  Based on the VE's
9  interrogatory responses, the ALJ concluded that Plaintiff could
10 perform her past relevant work as a supervisor and a preschool
11 teacher.  (AR 46.)  Accordingly, he found her not disabled.  (AR
12 47.)  He also noted that she could likely perform other work in
13 the national economy, although he did not make any actual
14 findings at step five.  (Id.)

15 **V.   DISCUSSION**

16      Plaintiff argues that the ALJ failed to properly consider
17 the opinion of her treating physician, neurologist Dr. Dhia Al-
18 Wardi, or articulate legally sufficient reasons for discrediting
19 her subjective symptom testimony and the lay-witness statement of
20 her friend Bertha Barajas.  (J. Stip. at 3, 5, 16-17, 22.)

21      A.   The ALJ Properly Assessed Dr. Al-Wardi's October 13,
22           2011 Statement

23      Plaintiff argues that the ALJ "did not provide specific and
24 legitimate reasons supported by substantial evidence for
25 rejecting" statements Dr. Al-Wardi made in a "To Whom It May
26 Concern" letter dated October 13, 2011.  (Id. at 5.)  For the
27 reasons discussed below, remand is not warranted on this ground.
28

6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

#### 1.   Applicable law

Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the claimant, (2) those who examined but did not treat the claimant, and (3) those who did neither.  Lester, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's.  Id.

This is so because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant. Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).  If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight.  § 404.1527(c)(2). If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors.  § 404.1527(c)(2)-(6).

When a treating physician's opinion is not contradicted by other evidence in the record, it may be rejected only for "clear and convincing" reasons.  See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (citing Lester, 81 F.3d at 830-31).  When it is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it.  Id.

7

(citing <u>Lester</u>, 81 F.3d at 830-31).  Furthermore, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings."  <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>accord</u> <u>Batson v. Comm'r of Soc. Sec. Admin.</u>, 359 F.3d 1190, 1195 (9th Cir. 2004).

### 2. Relevant background

On March 16, 2011, Plaintiff had a hysterectomy.  (AR 75, 256.)  Following her surgery, she was admitted to the San Gabriel Valley Medical Center to have her sutures removed, complaining of severe pain and anxiety.  (AR 258-59, 263.)  Her charts from this visit note possible pneumonia and hyperglycemia.  (AR 257.)  She returned to the medical center on April 10, 2011, with a postoperative wound infection and was again admitted; it was noted that she suffered from "out-of-control" diabetes.  (AR 313, 315-16, 321-22.)  She visited the center again on April 28, 2011, complaining of postsurgical wound pain, and was diagnosed with "intractable abdominal pain," leg pain, and dyspnea and was discharged that day.[3]  (AR 341-42.)

On May 12, 2011, Plaintiff's insurance approved an office visit with Dr. Al-Wardi for "pain in limb," describing Plaintiff as an "established patient with [a] new diagnosis."  (AR 458.)  On May 20, 2011, an MRI of her lumbar spine was also approved (AR 459), along with a follow-up visit with Dr. Al-Wardi to review the MRI results (AR 462).  Soon thereafter, on May 24, 2011,

---

[3] Dyspnea is shortness of breath.  <u>Stedman's Medical Dictionary</u> 556 (27th ed. 2000).

Plaintiff had an MRI of her lumbar spine.  (AR 460.)  The results were essentially normal: "L5-S1 disc desiccation" but "otherwise unremarkable."[4]  (AR 461.)

On July 8, 2011, Plaintiff returned to the medical center, complaining that she was "weak."  (AR 359.)  A doctor noted that Plaintiff had "labile hyperglycemia" and "exacerbation of thigh pain."  (AR 360, 364.)  She was instructed to continue with her prescribed medication[5] and follow up with her primary-care

_____

[4] Desiccation is dehydration.  Stedman's, supra, at 483. "Degeneration of the discs particularly in the moving sections of the spine (cervical and lumbar levels) is a natural process of aging.  This dehydration or desiccation of the disc material reduces the flexibility and typically the height of the disc." Degenerative Disc Disease, UCLA Health, http:// neurosurgery.ucla.edu/degenerative-disc-disease (last accessed Sept. 13, 2016).  "Nearly everyone experiences some disc degeneration after age 40."  Degenerative Back Conditions, Cleveland Clinic, http://my.clevelandclinic.org/services/ orthopaedics-rheumatology/diseases-conditions/degenerative-back-conditions (last accessed Sept. 13, 2016).

[5] Plaintiff was taking Cymbalta, methadone, Celebrex, Topamax, Cozaar, Novolog, and Levemir.  (AR 388.)  Cymbalta is the brand name of a selective serotonin and norepinephrine reuptake inhibitor used to treat depression and generalized anxiety disorder.  See Duloxetine, MedlinePlus, https:// medlineplus.gov/druginfo/meds/a604030.html (last updated May 15, 2016).  Methadone is used for severe pain in people who are expected to need pain medication around the clock for an extended period of time and who cannot be treated with other medications. See Methadone, MedlinePlus, https://medlineplus.gov/druginfo/ meds/a682134.html (last updated Aug. 15, 2016).  Celebrex is the brand name for celecoxib, a nonsteroidal antiinflammatory used to relieve pain, tenderness, swelling, and stiffness caused by arthritis and spondylitis.  See Celecoxib, http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a699022.html (last updated July 15, 2016).  Topamax is the brand name of a seizure medication also used to prevent migraine headaches.  See Topiramate, MedlinePlus, https://medlineplus.gov/druginfo/meds/ a697012.html(last updated Jan. 15, 2015).  Cozaar is the brand

(continued...)

doctor.[6]   (AR 364.)   She returned again on August 11, 2011, complaining of neck, back, and right-thigh pain, and it was noted that her diabetes was still out of control.   (AR 270-71.)   On August 17, 2011, she was admitted to the emergency room, complaining of hypoglycemia (AR 281), which was noted to have been resolved (AR 286).   Plaintiff was placed on a psychiatric hold because her symptoms were "psychogenic"; after being told that, she said she planned to run into the streets to kill herself.   (AR 286, 467.)[7]   She was discharged the following day with a diagnosis of "Axis I: Major Depression."   (AR 467.)   On August 23, 2011, her insurance approved another office visit with Dr. Al-Wardi.   (AR 463.)

On September 6, 2011, Plaintiff met with cardiovascular specialist Dr. Michael Yeh for a cardiac consultation.   (AR 496-98.)   She complained of swelling and pain and reported that she

_____

[5] (...continued) name of a medication used to treat high blood pressure and kidney disease.   See Losartan, MedlinePlus, https://medlineplus.gov/druginfo/meds/a695008.html (last updated Apr. 15, 2015).   Novolog is the brand name of an insulin aspart used to treat diabetes; insulin aspart is a short-acting, manmade version of human insulin.   See Insulin Aspart (rDNA Origin) Injection, MedlinePlus, https://medlineplus.gov/druginfo/meds/a605013.html (last updated May 15, 2016).   Levemir is the brand name of an insulin detemir used to treat diabetes; insulin detemir is a long-acting, manmade version of human insulin.   See Insulin Detemir (rDNA Origin) Injection, MedlinePlus, https://medlineplus.gov/druginfo/meds/a606012.html (last updated July 15, 2016).

[6] On July 21, 2011, her primary-care doctor authorized a front wheeled walker for Plaintiff because of her "difficulty in walking."   (AR 456.)

[7] Plaintiff later reported "having been frustrated and not actually suicidal."   (AR 657.)

10

1  was using a walker.  (Id.)  Dr. Yeh examined Plaintiff and found

2  that she had an abnormal electrocardiogram, "minimal" edema, and

3  "acceptable" blood pressure.  (AR 497.)  He recommended that she

4  undergo a stress test and a "2-D echo"[8] and that she continue

5  taking her medication.  (Id.)

6      Plaintiff saw Dr. R. Ray Quemena, a podiatrist, on September

7  8, 2011.  (AR 513.)  She complained of "difficulty walking

8  especially on the right foot, with cramps and unstable gait."

9  (Id.)  Dr. Quemena noted that Plaintiff had pain, diabetes with

10 neuropathy, abnormal gait, and hammertoes.  (Id.)

11     On September 27, 2011, Plaintiff underwent a stress

12 echocardiogram as recommended by Dr. Yeh and had a "[n]ormal

13 cardiac response to stress."  (AR 464.)  She followed up with Dr.

14 Yeh on October 11, 2011, complaining that her legs were still

15 swollen and that her hands also felt swollen and tight.  (AR 441-

16 43.)  Dr. Yeh noted that her edema was "not resolved and [was]

17 progressively worsening" and that, although the stress test was

18 normal, "the valvular pathology [had] not been ruled out

19 completely."  (AR 442.)  Because a physical exam was "not

20 revealing from the valvular point of view," Dr. Yeh again

21 recommended a 2D echo test.  (Id.)  Dr. Yeh noted that

22 Plaintiff's hypertension was controlled, and he recommended that

23 she exercise and follow a low-fat diet.  (AR 442-43.)  A 2D echo

24 was performed on October 26, 2011, and the findings were normal.

25

26      [8] An echocardiogram ("echo") is the record obtained from the
   use of ultrasound to investigate the heart.  Stedman's, supra, at
27 563.  A two-dimensional echo is an echo "in which an image is
   reconstructed from the echoes stimulated and detected by a linear
28 array or moving transducers."  Id.

(AR 488-89.)

Meanwhile, on October 13, 2011, Dr. Al-Wardi wrote a note "To Whom It May Concern," stating in its entirety that

> [Plaintiff] is under my care for severe fibromyalgia, severe depression, diabetes out of control and frequent migraine[.]  In my opinion, she is perminently [sic] disabeld [sic].

(AR 437.)  In response to a January 2012 request from the Social Security Agency for medical records relating to Plaintiff's care, Dr. Al-Wardi's office responded that "[n]o records [were] found." (AR 536.)

On October 12, 2011, Dr. Quemena referred Plaintiff to physical therapy.  (AR 474.)  She attended physical therapy on October 21, 25, and 26 and November 1, 2, 8, and 10, 2011.  (AR 475-78.)  On November 2, 2011, she was "feeling better" and had "walked several blocks" to the appointment.  (AR 476.)  On November 8, 2011, she reported a gradual reduction in pain and an increase in her ability to walk and stand; she again "walked four to five blocks" to attend therapy.  (Id.)  In an office visit with Dr. Yeh on November 8, 2011, it was noted that her edema had improved.  (AR 486.)  She did not schedule a follow-up after her November 10, 2011 physical-therapy appointment, and she was discharged from physical therapy on December 21.  (AR 475.)

In February 2012, two Social Security medical consultants, Dr. Ulin Sargeant and Dr. Thaworn Rathana-Nakintara, examined Plaintiff.  (AR 521-26, 529-33.)  Dr. Sargeant, who was board eligible in internal medicine (AR 526), found that Plaintiff had pain in her right thigh but was "not impressed that [it was] a

1   fibromyalgia presentation" (AR 525).  Dr. Sargeant also noted
2   that she had diabetes mellitus and her hypertension appeared well
3   controlled.  (Id.)  In a functional assessment, Dr. Sargeant
4   found that Plaintiff was "able to lift and carry 50 pounds
5   occasionally and 25 pounds frequently due to her right lower
6   extremity pain[,] . . . to push and pull frequently[,] . . .
7   [and] to walk and stand six hours out of an eight-hour workday
8   with breaks."  (Id.)  Further, Dr. Sargeant opined that Plaintiff
9   was "able to sit six hours out of an eight-hour workday with
10  breaks."  (AR 526.)  Noting that Plaintiff reported using a
11  walker to walk up to 10 blocks or more and was able to stand for
12  a long period of time with it (AR 521), and after observing that
13  she "did not appear to have dependence on the walker when she was
14  ambulating" and that she "refuse[d] to demonstrate any ambulation
15  without the walker" (AR 523), Dr. Sargeant was not able to "find
16  anything in her physical examination to confirm that a walker
17  [was] necessary" (AR 526).  Indeed, Plaintiff's "physical
18  examination . . . seem[ed] to be inconsistent with a generalized
19  neurological deficit or even of one that warrants the use of a
20  walker."  (AR 525.)  He found that Plaintiff was "able to climb,
21  balance, kneel, and crawl frequently" and was "able to walk on
22  uneven terrain, climb ladders, and work at heights frequently."
23  (AR 526.)  Dr. Sargeant found no limitations in her hearing,
24  sight, or use of her hands for fine and gross manipulation.
25  (Id.)

26      Dr. Rathana-Nakintara, a board-eligible psychiatrist (AR
27  533), completed a psychiatric evaluation on February 14, 2012 (AR
28  529).  After interviewing Plaintiff and conducting a mental-

13

status examination,[9] Dr. Rathana-Nakintara diagnosed her with
adjustment disorder with depressed mood.  (AR 532.)  Dr. Rathana-
Nakintara found that Plaintiff "would have no limitations
performing simple and repetitive tasks and no limitations
performing detailed and complex tasks."  (Id.)  She "would be
able to perform work activities on a consistent basis without
special or additional supervision," and she would "have no
limitations completing a normal workday or work week due to her
mental condition . . . [or] accepting instructions from
supervisors and interacting with coworkers and the public."
(Id.)  Dr. Rathana-Nakintara found that Plaintiff "would be able
to handle the usual stresses, changes and demands of gainful
employment."  (Id.)  Her prognosis was good.  (Id.)  In April
2012, following these state medical examinations, Dr. James
Metcalf[10] reviewed Plaintiff's records and concluded that her

_____

[9] During the examination, Dr. Rathana-Nakintara tested
Plaintiff's speech ("fluent with normal prosody, rate, and
rhythm"); mood ("not depressed or anxious"); affect
("appropriate, reactive, and congruent with mood"); thought
process ("linear and goal-directed"); thought content ("no
evidence of auditory or visual hallucinations, delusions, or
illusions"); cognition, orientation, and memory ("alert and
oriented to person, place, time, and situation"); concentration
(noting that Plaintiff insisted upon having paper and pencil for
subtraction but "did well on serial threes subtraction" and "was
able to spell the word 'world' forward and backward"); abstract
thinking ("[w]hen . . . asked to state the similarities between
an apple and an orange, [Plaintiff] stated that they were both
fruit" and "was able to analyze the meaning of simple proverbs");
fund of knowledge ("able to name two past Presidents, and the
current President," and "was able to identify the capital of the
United States and of California"); and insight and judgment ("has
common sense understandings").  (AR 531.)

[10] Dr. Metcalf's signature line includes a
(continued...)

14

1  allegations were "not credible" and that "[b]ased on medical
2  evidence in file, [she] should be able to perform medium work."
3  (AR 565.)

4      On April 11, 2012, reviewing psychiatrist Z. Yousuf[11]
5  determined that Plaintiff's adjustment disorder was not severe.
6  (AR 544; see also AR 547.)  Dr. Yousuf also noted that Plaintiff
7  had mild restrictions in activities of daily living; had no
8  difficulties in maintaining social functioning, concentration,
9  persistence, or pace; and had not experienced any episodes of
10 decompensation of extended duration.  (AR 554.)  Dr. Yousuf
11 opined that Plaintiff had "no workplace limitations" and "should
12 be able to perform a full range of tasks."  (AR 556.)  He noted
13 that she had "one psych hospitalization at [the] same time as [a]
14 diabetic reaction" and that her medication was "effective."
15 (Id.)

16     On May 28, 2012, Plaintiff underwent a CT scan of her head
17 and lumbar spine.  (AR 572, 574.)  A "5mm central disc protrusion
18 at L5-S1" was noted (presumably the same L5-S1 disc desiccation
19 noted in the May 24, 2011 MRI), but the results were otherwise
20 unremarkable.  (Id.)  She was hospitalized from August 2 to 6,
21

22     [10] (...continued)
   medical-consultant code of 19, indicating "[i]nternal [m]edicine"
23 (AR 565); see Program Operations Manual System (POMS) DI
   24501.004, U.S. Soc. Sec. Admin. (May 5, 2015),
24 http://policy.ssa.gov/poms.nsf/lnx/
   0424501004.
25

26     [11] Dr. Yousuf's signature line includes a medical-consultant
   code of 37, indicating "[p]sychiatry" (AR 544); see Program
27 Operations Manual System (POMS) DI 24501.004, U.S. Soc. Sec.
   Admin. (May 5, 2015), http://policy.ssa.gov/poms.nsf/lnx/
28 0424501004.

                              15

2012, for leg pain and weakness, diabetes, and high blood pressure.  (AR 584.)  During that hospitalization, a doctor noted that Plaintiff "likely" had conversion disorder[12] and that "her legs [were] actually strong."  (AR 645.)  She was told that because no "organic cause for her weakness" existed, she could "motivate herself to gain her strength back."  (Id.)  During a health-center visit on August 22, 2012, she was "upset that all testing done [previously] showed that nothing was wrong."  (AR 710.)

### 3.   Analysis

The ALJ considered but gave "reduced weight" to Dr. Al-Wardi's October 13, 2011 note, "essentially adopt[ing]" the assessments of the mental-health state-agency consultants and "essentially agree[ing]" with state-agency consultants concerning Plaintiff's physical limitations.  (AR 43.)  Because Dr. Al-Wardi's note was contradicted by other medical opinions in the record, the ALJ had to give only specific and legitimate reasons for rejecting it.  See Carmickle, 533 F.3d at 1164.  As discussed below, the ALJ did so.

First, the ALJ found that Dr. Al-Wardi's two-sentence note did not amount to a "medical opinion."  (AR 42.)  He stated that he was "hard-pressed to find a formal functional assessment from a treating source that even rises to the status of a medical

---

[12] Conversion disorder is a mental condition in which a person has nervous-system (neurologic) symptoms that cannot be explained by medical evaluation.  See Conversion disorder, MedlinePlus, https://medlineplus.gov/ency/article/000954.htm (last updated Oct. 31, 2014).  The ALJ was "disinclined to adopt" the conversion-disorder diagnosis (AR 38), a finding that Plaintiff has not challenged on appeal.

opinion for present purposes." (AR 42.) Indeed, the statement
from Dr. Al-Wardi is a handwritten note, directed "To Whom It May
Concern," comprising two sentences. (AR 437.) Such conclusory
statements, with no supporting explanation or citation to medical
records, may permissibly be rejected by an ALJ. See Molina v.
Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) (ALJ may permissibly
reject check-off reports that do not contain explanation of basis
for conclusions); Batson, 359 F.3d at 1195 ("[A]n ALJ may
discredit treating physicians' opinions that are conclusory,
brief, and unsupported by the record as a whole . . . or by
objective medical findings[.]"). The ALJ could also properly
discredit Dr. Al-Wardi's two-line note because it was perfunctory
and too vague to be useful. See Thomas v. Comm'r of Soc. Sec.
Admin., 480 F. App'x 462, 463 (9th Cir. 2012) (ALJ permissibly
rejected treating-physician opinion that was "perfunctory and
unsupported by specific functional limitations"); King v. Comm'r
of Soc. Sec. Admin., 475 F. App'x 209, 210 (9th Cir. 2012) (ALJ
properly rejected treating physician's finding of mild to
moderate limitations in part because they were "too vague to be
useful").

Further, the ALJ found that Dr. Al-Wardi's disability note
was not supported by any treatment notes or other evidence of the
treatment relationship. (AR 42.) Indeed, the extent of Dr. Al-
Wardi's relationship with Plaintiff is not clear from the record.
There is no evidence of how often she actually met with Dr. Al-
Wardi, and Dr. Al-Wardi did not provide any medical records or
treatment notes when requested to do so. (AR 536.) Other than
Dr. Al-Wardi's statement that Plaintiff "[was] under [his] care"

17

and the four approvals by her insurance company for office visits or tests requested by Dr. Al-Wardi (see AR 437, 458-59, 462-63), nothing in the record indicates that Dr. Al-Wardi ever examined Plaintiff.  Nor does anything in the record indicate that Dr. Al-Wardi necessarily reviewed Plaintiff's medical records.  The ALJ could properly have relied on the apparent minimal treatment history and examination findings to discount Dr. Al-Wardi's opinion.  See Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003) (treating physician's opinion properly rejected when treatment notes "provide[d] no basis for the functional restrictions he opined should be imposed on [plaintiff]"); § 404.1527(c)(2)(i) ("[l]ength of the treatment relationship" and "frequency of examination" are relevant factors in assessing treating-source opinion); Edlund v. Massanari, 253 F.3d 1152, 1157 & n.6 (9th Cir. 2001) (as amended) (same); see also § 404.1527(c)(6) (extent to which doctor is familiar with record is relevant factor in deciding weight to give opinion).

     Next, the ALJ found that Dr. Al-Wardi's statement that Plaintiff was permanently disabled was not supported by the other medical evidence in the record.  (AR 43.)  Indeed, the medical records don't reflect any finding that Plaintiff is permanently disabled.  As the ALJ correctly summarized, her medical records are rife with unremarkable findings and normal test results.  (AR 37; see, e.g., AR 434 ("[m]ammogram is unremarkable"), 460-61 ("unremarkable MRI of the lumbar spine"), 464 ("[n]ormal cardiac response to stress"), 623 ("[n]ormal expiratory chest x-ray"), 625 ("[u]nremarkable noncontrast CT scan of the head"), 645 ("no organic cause for her weakness").)  Examining Dr. Sargeant

18

performed a complete physical evaluation of Plaintiff, finding
that she had no notable physical limitations.  (AR 521-26.)
Because Dr. Sargeant personally observed and examined Plaintiff,
and because the findings of that examination were consistent with
the objective evidence, Dr. Sargeant's opinion constitutes
substantial evidence supporting the ALJ's decision.  See
Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001)
(finding that examining physician's "opinion alone constitutes
substantial evidence, because it rests on his own independent
examination of [plaintiff]"); Andrews v. Shalala, 53 F.3d 1035,
1041 (9th Cir. 1995) (opinion of nontreating source based on
independent clinical findings may itself be substantial
evidence).

     The same analysis holds for Dr. Rathana-Nakintara, who
performed a complete psychiatric evaluation of Plaintiff and
found no functional limitations.  (AR 529-33.)  Dr. Al-Wardi was
a neurologist, not a psychiatrist, and thus his statement that
Plaintiff had "severe depression" was entitled to less weight.
See § 404.1527(c)(6) (in weighing medical opinions, ALJ will
generally give more weight to opinion of specialist when medical
issue is related to his or her area of speciality).  The
consulting psychiatrist, Dr. Rathana-Nakintara, found that
Plaintiff did not have significant limitations.  Dr. Rathana-
Nakintara's opinion also constitutes substantial evidence
supporting the ALJ's decision.  See Tonapetyan, 242 F.3d at 1149.

     Moreover, as the ALJ pointed out (AR 43), the examining
doctors apparently had access to record evidence that Dr. Al-
Wardi never saw and thus had a broader view of her limitations.

19

1   Accordingly, Dr. Al-Wardi's "outlier" opinion (id.), to the
2   extent it was even a formal medical opinion, was properly
3   discounted based on its inconsistency with the rest of the
4   opinion and medical evidence.  See Batson, 359 F.3d at 1195 (ALJ
5   may discredit treating physicians' opinions that are "unsupported
6   by the record as a whole").

7        Plaintiff argues that the ALJ was "required to recontact"
8   Dr. Al-Wardi to ascertain the basis of his opinion that Plaintiff
9   was permanently disabled.  (J. Stip. at 8.)  The authority
10  Plaintiff cites for that proposition, SSR 96-5p, 1996 WL 374183,
11  at *2 (July 2, 1996), states that the ALJ must make "every
12  reasonable effort" to recontact treating sources "when they
13  provide opinions on issues reserved to the Commissioner and the
14  bases for such opinions are not clear."  It goes on to state that
15  treating-source opinions finding that a person is disabled or
16  unable to work "can never be entitled to controlling weight or
17  given special significance."  Id. at *5.  As an initial matter,
18  and as previously noted, Dr. Al-Wardi's treatment relationship
19  with Plaintiff, if any, is unclear.  Thus, SSR 96-5p may not even
20  apply.  Further, as the ALJ noted (AR 43), the agency had already
21  contacted Dr. Al-Wardi and been told that he had no treatment
22  records for Plaintiff.  Thus, even if the ALJ's failure to
23  contact Dr. Al-Wardi again was error, it was harmless.  See
24  Mercado v. Colvin, No. 2:15-cv-01592 JRC, 2016 WL 3640314, at *6
25  (W.D. Wash. July 8, 2016) (interpreting relevant portion of SSR
26  96-5p as requiring ALJ to recontact doctor to obtain treatment
27  records).

28       Because the ALJ provided specific and legitimate reasons for

20

1  rejecting Dr. Al-Wardi's October 13, 2011 note, remand is not

2  warranted on this ground.[13]

3      B.   The ALJ Properly Assessed Plaintiff's Credibility

4      Plaintiff contends that the ALJ did not provide clear and

5  convincing reasons for discrediting her testimony. (J. Stip. at

6  16.)  For the reasons discussed below, the ALJ did not err.

7          1.   Applicable law

8      An ALJ's assessment of symptom severity and claimant

9  credibility is entitled to "great weight." See Weetman v.

10  Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779

11  F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to

12  believe every allegation of disabling pain, or else disability

13  benefits would be available for the asking, a result plainly

14  contrary to" the law.  Molina, 674 F.3d at 1112 (citing Fair v.

15  Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

16      In evaluating a claimant's subjective symptom testimony, the

17  ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d

18

19

20      [13] The ALJ also rejected Dr. Al-Wardi's statement because it
    "appear[ed] to be tainted by [Plaintiff's] objective to obtain a
21  report that states that she is disabled in order to receive
    disability benefits or other allowances" and because Dr. Al-Wardi
22  "appear[ed] to be actively assisting and advocating [Plaintiff's]
    attempt to obtain benefits, rather than simply treating
23  [Plaintiff] or offering an objective opinion that [was]
    corroborated by treatment records." (AR 43.)  Because the ALJ
24  provided other legally sufficient reasons for rejecting Dr. Al-
    Wardi's statement, the Court need not decide whether this was
25  error.  See Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050,
    1055 (9th Cir. 2006) (nonprejudicial or irrelevant mistakes
26  harmless); Donathan v. Astrue, 264 F. App'x 556, 559 (9th Cir.
    2008) (when ALJ provided proper, independent reasons to reject
27  treating physician's opinions, any error ALJ may have made as to
    other reasons was harmless and inconsequential).
28

at 1035-36.  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged."  Id. at 1036.  If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged."  Smolen, 80 F.3d at 1282 (emphasis in original).

If the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion.  See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as amended); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014).  The ALJ may consider, among other factors, (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties.  Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015) (as amended); Thomas, 278 F.3d at 958-59.  If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing."  Thomas, 278

1  F.3d at 959.

2          2.   <u>Relevant background</u>

3          In an undated disability report, Plaintiff stated that "it

4  ha[d] become such an ordeal just to take care of [her] home and

5  [her] own personal needs." (AR 152.)  In a function report dated

6  January 8, 2012, she stated that she was "in constant and

7  continuous pain on [her] right thigh," which "limit[ed] [her]

8  mobility." (AR 162.)  She could not sit for long, which made it

9  difficult for her to use a computer. (<u>Id.</u>)  She had difficulty

10 providing for her personal care because of cramping in her

11 fingers and hands. (AR 163.)  She noted that she had "become an

12 insomniac" and reiterated that she had problems in areas of

13 personal care. (<u>Id.</u>)  She stated that she sometimes forgot to

14 take her medication in the morning. (AR 164.)  Her mother

15 prepared all of her meals. (<u>Id.</u>)  She was unable to do house or

16 yard work because of "excruciating pain" and "deep" depression.

17 (AR 165.)  She went outside daily to water the lawn (if she was

18 not in excruciating pain or suffering deep depression) or when

19 she needed to attend doctor or therapy appointments. (<u>Id.</u>)  She

20 noted that she was able to crochet but could no longer decorate

21 cakes, as "squeezing piping gels hurt [her] hands." (AR 166.)

22 She stated that she used a walker and that the pain in her right

23 thigh paralyzed her. (AR 167.)  She ticked boxes to indicate

24 that her conditions affected her ability to lift, squat, bend,

25 stand, reach, walk, sit, kneel, climb stairs, see far, complete

26 tasks, and use her hands. (<u>Id.</u>)

27         In a disability report submitted on May 18, 2012, Plaintiff

28 stated that "[t]he constant excruciating chronic pain of

                                   23

fibromyalgia [had] run its course" and that she suffered from
"insomnia due to the pain" and "severe depression." (AR 173,
183.)[14] Her use of the walker had intensified, the cramping in
her fingers and hands prevented her from taking care of basic
hygiene and daily chores, and she had complete loss of bladder
control, severe anxiety, "massive" hair loss, and "stress
vomiting and nose bleeds." (AR 174.) She stated that she could
"no longer move on [her] own." (Id.) She wrote that she
suffered "from an apperent [sic] life-altering ghost illness" and
noted that there was "no blood test to prove [that her]
fibromyalgia exist[ed]." (AR 181.) She had been told by a
doctor that her issues were "all in [her] head" and that "labs
performed proved scientifically [she] was clear of any medical
condition"; on being told this, she was sent into "a frenzy of
outrage" and was committed to a psychiatric facility for
"speaking harsh words of suicidal tendencies." (AR 182.)

At the February 2013 hearing, Plaintiff testified that she
couldn't work because of "chronic pain that radiates, starting
from [her] legs and spread[ing] throughout [her] body." (AR 77.)
She found it "difficult to move" and became "stiff mainly because
of the pain." (Id.) She testified that her mood changes were
severe and that she suffered "uncontrollable pain, even with
medication." (Id.) The pain made her unable to fully
concentrate. (Id.) She had been told by her friends that she
had become forgetful (id.), and she testified that she had become

---

[14] The ALJ did not include fibromyalgia among Plaintiff's
impairments, a finding she has not challenged on appeal.

24

short tempered and anxious (AR 79).  She used a walker (id.) and
had "difficulty in carrying a gallon of milk" (AR 80).[15]  She
"always [had] pain in [her] leg" (id.) and found it "difficult to
get into the shower" (AR 81).  She was unable to keep up with her
personal hygiene.  (AR 82.)  Her hand cramped when she tried to
hold a toothbrush or hairbrush, it hurt to extend her arms, and
she had an incontinence problem.  (Id.)  She testified that she
did not do ordinary, routine household tasks but that she was
able to prepare her own meals, and she tried to follow her
prescribed diet.  (AR 84.)  She stated that she took her
medication in accordance with the prescribed frequency and
dosage, but that she didn't notice any changes when she did so.
(AR 85.)  She testified that since March 2011, her pain had
increased, and it was now stronger in her left leg than her
right.  (AR 85-86.)

       3.   <u>Analysis</u>

The ALJ credited some of Plaintiff's subjective complaints,
stating that he "afforded her the benefit of the doubt" and
therefore restricted her to no more than light work.  (AR 44.)
But he discredited her complaints to the extent they were
inconsistent with her RFC, finding that although her "medically
determinable impairments could reasonably be expected to cause
the alleged symptoms[,] . . . [her] statements concerning the
intensity, persistence and limiting effects of these symptoms
[were] not entirely credible."  (AR 41.)  As discussed below, to

_____

[15] A gallon of milk weighs approximately eight pounds.
<u>Hernandez v. Colvin</u>, No. 1:12-CV-00330-SMS, 2013 WL 4041862, at
*9 n.4 (E.D. Cal. Aug. 8, 2013).

the extent the ALJ rejected Plaintiff's subjective complaints, he provided clear and convincing reasons for doing so.

First, the ALJ found that Plaintiff's subjective complaints were not supported by the objective medical evidence. (AR 41-42.)  The ALJ was entitled to consider the lack of objective medical evidence as one factor in assessing her subjective complaints and credibility.  See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); Carmickle, 533 F.3d at 1161 ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony.").

Plaintiff claimed that she suffered from a variety of completely debilitating illnesses, but she admitted that "scientifically [she] was clear of any medical condition."  (AR 182.)  She alleged that she could not walk without a walker and that her pain made it nearly impossible to take care of daily tasks and personal hygiene, yet Dr. Sargeant was unable to find any evidence to confirm that a walker was necessary or that she had any limitations in using her hands for fine or gross manipulation.  (AR 523.)  In fact, Dr. Sargeant found that Plaintiff's "gait and balance" appeared "strong and stable" and that "[m]uch of the weight during ambulation appeared to be on her feet rather [than] on the walker itself."  (Id.)  One of the most recent doctor's visits in the record resulted in a finding that no "organic cause for her weakness" existed.  (AR 645.)  Drs. Sargeant, Rathana-Nakintara, Metcalf, and Yousuf all found

that she had no significant workplace limitations and that she could perform at least a full range of light work.  And as the ALJ noted, her alleged conversion disorder was not "established by repeated diagnoses by acceptable medical sources over time," and "neither the consultative physician, to whom [Plaintiff] reportedly mentioned the condition, nor the consultative psychiatrist, who is a specialist in mental disorders, included it among their diagnostic impressions." (AR 38 (citations omitted).)  Plaintiff has not challenged that finding on appeal.

Second, the ALJ properly cited an absence of commensurate treatment (AR 43) and Plaintiff's refusal to follow testing and treatment plans (AR 37) as reasons for discrediting her testimony.  Indeed, Dr. Sargeant noted that Plaintiff "refuse[d] to demonstrate any ambulation without the walker." (AR 523.) Plaintiff originally complained of right-side pain (see AR 75, 140) but later stated that the pain was stronger on her left (AR 85-86); nonetheless, there is no evidence she ever sought treatment for her left-side pain.  Further, there are no — or sparse — records of treatment for her alleged aneurysm, heart problems, sporadic paralysis, and lumps in her breast.  The ALJ also observed that Plaintiff had "been noted to not be taking medications as instructed." (AR 44; see, e.g., AR 164 (Plaintiff stating that she sometimes forgot to take medication in morning), 530 (doctor noting that Plaintiff had "not been taking Cymbalta for the last two weeks"), 632 (nurse practitioner noting that Plaintiff reported not being able to take insulin for three days because of "inability to move"), 722 (Plaintiff reporting at health-center visit that she "was not taking any insulin for 2-3

months" and "not checking [her] sugars daily").)   Thus,
sufficient evidence in the medical record supported the ALJ's
finding that Plaintiff was not complying with testing and
treatment plans.   See Tommasetti v. Astrue, 533 F.3d 1035, 1039
(9th Cir. 2008) (ALJ may discount claimant's testimony in light
of "unexplained or inadequately explained failure to seek
treatment or to follow a prescribed course of treatment"); SSR
96-7p, 1996 WL 374186, at *7 (July 2, 1996) (claimant's
statements "may be less credible if the level or frequency of
treatment is inconsistent with the level of complaints").

Third, the ALJ permissibly discounted Plaintiff's subjective
complaints because they were inconsistent with her reported daily
activities.   (AR 45.)   Indeed, she was able to walk four to five
blocks to her physical-therapy appointments in November 2011 (AR
476), Dr. Sargeant reported in February 2012 that she was able to
walk up to 10 blocks with a walker (AR 521), and she testified
that she was able to use public transportation to get to her
doctors' appointments (AR 79).   Her friend Barajas noted that
Plaintiff was able to perform three to four hours of chores at a
time (see AR 155; infra p. 30-31), although Plaintiff herself
said she needed to take rest breaks during those three or four
hours (AR 164).   These reported activities are at odds with her
May 18, 2012 statements that she could "no longer move on [her]
own" (AR 174) and was "no longer self-efficient" (AR 182) and
with her February 27, 2013 testimony that she was in
"uncontrollable pain" (AR 77) and that she did not do "ordinary
routine household tasks such as mopping, dusting, sweeping,
vacuuming" (AR 84).   Also, she testified at the hearing that she

prepared her own meals (AR 84), something she claimed in a function report she did not do (AR 164). As such, the ALJ properly discounted Plaintiff's credibility because her alleged daily activities were inconsistent with statements she had made about her allegedly completely debilitating symptoms. See Molina, 674 F.3d at 1112 (ALJ may discredit claimant's testimony when "claimant engages in daily activities inconsistent with the alleged symptoms" (citing Lingenfelter, 504 F.3d at 1040)); Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999) (in assessing credibility, ALJ can consider whether plaintiff's statements were inconsistent with other statements and evidence).

Plaintiff contends that the ALJ "did not provide which of [her] specific statements he accepted or rejected." (J. Stip. at 17.) An ALJ is required to "specifically identify the testimony [from a claimant] she or he finds not to be credible and . . . explain what evidence undermines the testimony." Treichler, 775 F.3d at 1102 (alterations in original); see also Brown-Hunter, 806 F.3d at 493; SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996) (decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight"). Here, however, the ALJ did so. He summarized the testimony about her "additional issues," specifically including her claimed aneurysm and breast lumps (AR 37), and then explained why they were not supported by the medical evidence: it was "notable for the number of diagnostic imaging scans, medical tests, and other clinical studies that have yielded repeatedly unremarkable findings." (Id.) He engaged in the same analysis

with respect to Plaintiff's "claimed" "neuropsychiatric issues."
(AR 37-38.)   Finally, he pointed to specific statements Plaintiff
made that he found not credible and explained why, including that
she was unable to sit, stand, or walk for very long and that she
had difficulty lifting a gallon of milk.   (AR 41-42.)   The ALJ
therefore did not err.   See Treichler, 775 F.3d at 1103 (ALJ's
analysis "need not be extensive" as long as he "provide[s] some
reasoning in order for [the court] to meaningfully determine
whether the ALJ's conclusions were supported by substantial
evidence").

     In sum, the ALJ provided clear and convincing reasons for
finding Plaintiff only partially credible.   Because those
findings were supported by substantial evidence, this Court may
not engage in second-guessing.   See Thomas, 278 F.3d at 959.
Plaintiff is not entitled to remand on this ground.

     C.   The ALJ Properly Assessed the Credibility of the Lay
          Witness

     Plaintiff contends that the ALJ did not provide germane
reasons for discrediting the testimony of her friend Barajas.
(J. Stip. at 22.)   For the reasons discussed below, remand is not
warranted on this basis.

          1.   Applicable law

     "In determining whether a claimant is disabled, an ALJ must
consider lay witness testimony concerning a claimant's ability to
work."   Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009)
(citing Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1053
(9th Cir. 2006)); see also § 404.1513(d) (statements from
spouses, parents, other relatives, and friends can be used to

1  show severity of impairments and effect on ability to work).

2  Such testimony is competent evidence and "cannot be disregarded

3  without comment." <u>Bruce</u>, 557 F.3d at 1115 (emphasis in original)

4  (citing <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1467 (9th Cir. 1996));

5  <u>Robbins</u>, 466 F.3d at 885 ("[T]he ALJ is required to account for

6  all lay witness testimony in the discussion of his or her

7  findings.").  When rejecting the testimony of a lay witness, an

8  ALJ must give specific reasons germane to that witness.  <u>Bruce</u>,

9  557 F.3d at 1115; <u>see also</u> <u>Stout</u>, 454 F.3d at 1053.

10      An ALJ's failure to address a lay witness's testimony is

11  harmless if it is "'inconsequential to the ultimate nondisability

12  determination' in the context of the record as a whole." <u>Molina</u>,

13  674 F.3d at 1122 (citations omitted); <u>see also</u> <u>Tommasetti</u>, 533

14  F.3d at 1038.  That happens when "the same evidence that the ALJ

15  referred to in discrediting [the claimant's] claims also

16  discredits [the lay witness's] claims." <u>Molina</u>, 674 F.3d at 1122

17  (alterations in original) (citing <u>Buckner v. Astrue</u>, 646 F.3d

18  549, 560 (8th Cir. 2011)).

19          2.   <u>Relevant background</u>

20      Barajas submitted a third-party function report dated

21  January 6, 2012.  (AR 153-60.)  She stated that she spent three

22  to five hours a day with Plaintiff and assisted her with her

23  shopping needs.  (AR 153.)  Barajas noted that Plaintiff was

24  unable to sit for long periods of time, cramping in her hands

25  caused her to drop things, and she needed assistance in many

26  areas of personal care.  (AR 153-54.)  Barajas cited Plaintiff's

27  depression as a reason she could not complete many activities.

28  (AR 155.)  She also noted that Plaintiff was "able to do most

31

1  household chores but at a slow pace." (<u>Id.</u>)  These chores,
2  according to Barajas, took three to four hours to complete.
3  (<u>Id.</u>)  Plaintiff was able to leave the house for doctor's
4  appointments and shopping. (AR 156.)  Barajas ticked boxes
5  indicating that Plaintiff had trouble lifting, squatting,
6  bending, standing, reaching, walking, sitting, kneeling, stair
7  climbing, completing tasks, concentrating, and using her hands.
8  (AR 158.)  Barajas noted that Plaintiff was unable to walk more
9  than 50 yards without taking a 10-minute rest. (<u>Id.</u>)  She stated
10 that Plaintiff used a walker and glasses "all the time" (AR 159)
11 and was "confine[d] to a walker and her memories" (AR 160).

12        3.  <u>Analysis</u>

13     The ALJ noted that he was required to consider witness
14 declarations, such as that provided by Barajas. (AR 45.)
15 However, he accorded "limited weight" to Barajas's statements
16 because they were "not fully consistent with the overall
17 evidence" in the record. (AR 46.)  He noted that Barajas
18 "echoed" many of Plaintiff's allegations. (AR 41.)  He also
19 noted that she "[did] not appear to be specially trained to make
20 exacting observations as to medical signs and symptoms" and that
21 she could not be considered unbiased "because of her friendship
22 with [Plaintiff]." (AR 46.)

23     Plaintiff argues that the ALJ "failed to give germane
24 reasons for rejecting this extremely relevant testimony" and "did
25 not specifically indicate what he accepted or rejected" of
26 Barajas's report. (J. Stip. at 22.)  But as discussed above, the
27 ALJ fully summarized the medical evidence and discussed why it
28 was inconsistent with Plaintiff's account of her symptoms, an

account that was "echoed" by Barajas.  (Compare, e.g., AR 155 (Barajas noting that it takes three to four hours for Plaintiff to complete chores) with 164 (Plaintiff noting same) and AR 158 (Barajas ticking boxes for lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, concentration, and using hands as activities affected by Plaintiff's condition) with 167 (Plaintiff ticking same boxes, except adding "seeing" and leaving out "concentration") and AR 159 (Barajas noting that Plaintiff does not handle personal stress well and that she uses walker and glasses "all the time") with 168 (Plaintiff noting same) and AR 160 (Barajas noting that methadone makes Plaintiff lethargic) with 169 (Plaintiff noting same).)

Because the ALJ properly discredited Plaintiff's subjective complaints and because Barajas's function report echoed those complaints, the ALJ necessarily gave germane reasons for assigning limited weight to Barajas's statements.  See Valentine v. Comm'r of Soc. Sec., 574 F.3d 685, 694 (9th Cir. 2009) (holding that because "the ALJ provided clear and convincing reasons for rejecting [claimant's] own subjective complaints, and because [the lay witness's] testimony was similar to such complaints, it follows that the ALJ also gave germane reasons for rejecting [the lay witness's] testimony"); cf. Molina, 674 F.3d at 1117 ("Where lay witness testimony does not describe any limitations not already described by the claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply equally well to the lay witness testimony, it would be inconsistent with our prior harmless error precedent to deem the

ALJ's failure to discuss the lay witness testimony to be

prejudicial per se."). The ALJ also noted that Barajas's report

was inconsistent with the overall evidence. (AR 46.) That was

also a germane reason for discounting it. See Bayliss v.

Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005) ("[i]nconsistency

with medical evidence" is germane reason for discounting lay

opinion).

That Barajas was not "specially trained" and that her

allegations might have been biased because of her friendship with

Plaintiff might not have been appropriate, germane reasons for

the ALJ to discount her statements. See § 404.1513(d)(4) (ALJ

may use statements from nonmedical sources to show severity of

impairments and how they affect claimant's ability to work); cf.

Smolen, 80 F.3d at 1289 ("The fact that a lay witness is a family

member cannot be a ground for rejecting his or her testimony.").

But see Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)

(finding that claimant's former girlfriend's "close relationship"

with claimant such that she was "possibly 'influenced by her

desire to help him'" was germane reason to discount her lay-

witness testimony (alteration omitted)). But any potential error

was harmless because the ALJ provided two sufficient and germane

reasons for discounting Barajas's statement: her report echoed

Plaintiff's subjective symptom allegations, which he had already

discredited, and it was inconsistent with the medical record.

Cf. Carmickle, 533 F.3d at 1162-63 (upholding credibility

determination despite errors when remaining reasons supporting it

were valid). Reversal therefore is not warranted on this ground.

34

**VI.   CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[16] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.


DATED: September 26, 2016         _____
                                  JEAN ROSENBLUTH
                                  U.S. Magistrate Judge

---

[16] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

35